**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| VILLAGE OF SOLOMON, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>U.S. ARMY CORPS OF ENGINEERS PACIFIC OCEAN DIVISION, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-00073-SLG |

## DECISION AND ORDER

Before the Court at Docket 17 is Plaintiffs'[1] Opening Brief. Defendants[2] filed a response in opposition at Docket 25, to which Plaintiffs replied at Docket 28. Oral argument was heard on June 16, 2026.[3]

## BACKGROUND

This case concerns Defendants' issuance of a Clean Water Act Section 404 permit for a dredge mining operation in the Bonanza Channel (the "Channel") located about 25 miles east of Nome, Alaska.[4] "The proposed project would be

[1] Plaintiffs are the Village of Solomon, Native Village of Council, King Island Native Community, Chinik Eskimo Community, and Native Village of White Mountain. Docket 9 at ¶¶ 9-13.

[2] Defendants are the U.S. Army Corps of Engineers (Corps) Pacific Ocean Division and Brigadier General Joseph C. Goetz, sued in his official capacity as Commanding General and Division Engineer, Pacific Ocean Division, Corps. Docket 9 at ¶¶ 18-19.

[3] Docket 36.

[4] AR000347.

the first suction dredge mining operation of this scale within a shallow estuarine environment in the State of Alaska."[5]

### I. The Bonanza Channel

The Bonanza Channel is an estuary connecting the four rivers in Safety Sound lagoon and is one of two places where the Safety Sound lagoon connects to the Bering Sea.[6] The Bonanza Channel contains numerous "special aquatic sites" including vegetated shallows and mudflats.[7] Vegetated shallows in the Channel support submerged aquatic vegetation that is considered essential fish habitat for Pacific salmon and other fish species.[8] The vegetated shallows also provide food for birds.[9] The mudflats in the Channel are transitional zones for terrestrial and aquatic species that provide "high-quality bird and shellfish habitats," including habitat for burrowing invertebrates that foraging shorebirds rely on.[10] Threatened and endangered species occur in the area, including spectacled and Steller's eiders and bearded and Arctic ringed seals, and the region surrounding

---

[5] AR002292.

[6] AR002292; Docket 17-6 at ¶ 5 (Ojanen Decl.) ("Four rivers branch out of the Safety Sound lagoon: the Eldorado, Flambeau, Bonanza, and Solomon.").

[7] AR002287. "Special aquatic sites" are areas "possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values . . . significantly influencing or positively contributing to the . . . vitality of the entire ecosystem of a region." 40 C.F.R. § 230.3(m).

[8] AR000354; AR000420; AR002292-93; AR002368; AR005207.

[9] AR002295.

[10] AR000493; AR000521.

the Bonanza Channel hosts a variety of birds, including geese, cranes, swans, ducks, shorebirds, and other migratory birds.[11] The area is a popular site for birdwatching, and summer birding activities in the Nome area generate an estimated $1.68 million in annual revenue.[12] Plaintiffs' tribal members hunt birds, collect eggs, fish for various species, and gather edible and medicinal plants in and around the Bonanza Channel.[13] Subsistence use in the area is important "not just [as] a means for food security, but also for its cultural significance and way of life."[14]

## II. The Project

In March 2018, IPOP, LLC applied for a permit to dredge an unspecified 100-acre area within its mining claims over a one-year period.[15] IPOP later revised the scope of its permit application to suction dredge material from a 2.7-mile-long channel in the Bonanza Channel over several years.[16] In response to public comments, IPOP proposed as part of the Project to complete a case study during

---

[11] AR002293-95.

[12] AR002294-95; AR002383.

[13] Docket 17-1 at ¶¶ 6-8 (Timbers Decl.); Docket 17-2 at ¶ 6 (Cynthia Gray Decl.); Docket 17-4 at ¶¶ 3-4 (Hunter Gray Decl.); Docket 17-6 at ¶¶ 6-8 (Ojanen Decl.); Docket 17-8 at ¶¶ 7-9 (Katya Gray Decl.); Docket 17-9 at ¶¶ 7-10 (Ashenfelter Decl.).

[14] AR002317.

[15] AR000347; AR000359.

[16] AR000352; AR002287-89; AR002292.

the first year of the Project "to gather information that could inform an understanding of impacts from the full-scale mining effort."[17] In its proposal for the case study, IPOP stated that "there is little to no scientific data or literature to reference that directly addresses the ecosystem of a northern latitude estuary or lagoon, and that there has been no prior dredging operations like the proposed project in intertidal areas in Alaska that could be used as a case study."[18] IPOP explained that the "case study [was] intended to quantify the impacts from operations to factors such as [submerged aquatic vegetation], benthos, flow regimes, bathymetry, and salinity, as well as to provide a model of sediment plumes for full-scale operations under diverse weather conditions, and demonstrate impacts to [essential fish habitat] would be temporary . . . [and] to demonstrate the success of the applicant's proposed reclamation plan."[19] IPOP further asserted that the case study would allow the Corps to "make a 'defensible permitting decision.'"[20] After reviewing IPOP's revised proposal, the Alaska District concluded that "[b]y proposing such a [case] study, the applicant shows they do not have enough information to provide to the Corps to make conclusions regarding the potential impacts to waters of the U.S., which is necessary for the

[17] AR002289; AR002297.

[18] AR002300.

[19] AR002307.

[20] AR002309-10.

Corps to determine compliance with the 404(b)(1) Guidelines."[21]

IPOP's one-year case study proposed to dredge approximately 1,200 feet of the 2.7-mile Project channel to a depth of 28 feet.[22] The ensuing full-scale mining operation would dredge the remaining 13,000 feet of the 2.7-mile Project channel at a depth of 31 feet over the next five years .[23] In this revised proposal to the Alaska District, IPOP proposed to restore the bathymetry of the dredged portions to leave a 7-foot deep channel.[24] In total, IPOP's revised proposal sought to dredge approximately 4.9 million cubic yards of material from the Bonanza Channel and the permanent disposal of dredged material in approximately 192.5 acres of the Channel.[25] Based on this revised proposal, the Alaska District determined that the Project's purpose and need was "scientific information gathering and gold mining."[26]

On September 8, 2022, the commanding officer of the Corps' Alaska District ("Alaska District" or "POA"), denied IPOP's revised permit application, determining that "the project proposal fails to comply with Section 404 of the Clean Water Act;

---

[21] AR002310.

[22] AR002288.

[23] AR002288.

[24] AR002288-89.

[25] AR002287.

[26] AR002301.

in particular, the proposed project is not the least environmentally damaging practicable alternative (LEDPA) under the CWA 404(b)(1) Guidelines (40 CFR 230.10(a))" and the "issuance of this particular permit would not be in the public interest with regards to recreation."[27]

The Alaska District prepared a 116-page Memorandum for Record explaining its reasons for the permit denial, which is also dated September 8, 2022.[28] In the Memorandum, the Alaska District discussed several alternatives to IPOP's proposal, including Alternative 4, which would have required IPOP to fully restore the original bathymetry "in all impact areas."[29] But the Memorandum explained that IPOP was at that time unwilling to amend its proposed reclamation plan to provide for complete restoration of the bathymetry.[30] After concluding that IPOP's proposal was not the LEDPA, the Alaska District Memorandum listed "additional avoidance and mitigation measures the Corps finds appropriate to consider:"

> change the access location site and use the existing deeper portion of channel for access, incorporate the case study into proposed mine area (reducing impacts by 24.4 acres of WOTUS), change mining order of claims such that the access channel does not need to remain,

---

[27] AR002286.

[28] AR002287-2402.

[29] AR002351.

[30] AR002351; AR002359-60. The Alaska District determined that Alternative 4 was "practicable, and even if partially implemented, would result in avoidance and minimization of impacts to WOTUS compared to the applicant's preferred alternative." AR002361.

> reclaim to existing bathymetry within the dredged area, dispose of excess dredged material into Norton Sound (this, in conjunction with reclaiming to existing bathymetry, would reduce impacts by up to 71.7 acres of WOTUS), and test reclamation success through appropriate monitoring and allowing for time to observe success before continuing to mine.[31]

With its Memorandum, the Alaska District prepared a 22-page evaluation of the studies submitted by IPOP with its proposal that described numerous flaws in IPOP's methodology.[32]

IPOP appealed the Alaska District's decision to the Corps' Pacific Ocean Division Commander ("Pacific Division" or "POD"), and a Review Officer reviewed the administrative record and conducted an appeal conference.[33] The Pacific Division Commander then found that additional review of IPOP's application was warranted, vacated the Alaska District's decision, and elevated the case to the Pacific Division.[34]

In March 2024, the Pacific Division issued a Memorandum for Record approving IPOP's Section 404 permit application and issued IPOP a Department of the Army Permit.[35] In its Memorandum, the Pacific Division recounted that it

---

[31] AR002362.

[32] *See generally* AR002409-30.

[33] AR000359.

[34] AR000359.

[35] AR000467; *see also* AR000347-484 (Mem. for Record, Subject: Department of the Army Environmental Assessment and Statement of Findings for the Above-Referenced Standard Individual Permit Application); AR000242-73 (Department of the Army Permit); AR 001009-30 (Mem. for Record, Subject: Conference for IPOP, LLC's Administrative Appeal of the Alaska

had prepared an interim decision that found that IPOP's proposed project would not be the least environmentally damaging practicable alternative (LEDPA) but that another alternative, On-Site Alternative 2a, would be the LEDPA.[36] IPOP then agreed to proceed with Alternative 2a and the Memorandum analyzes Alternative 2a as IPOP's proposal.[37]

Alternative 2a involves dredging 4.5 million cubic yards in the Channel over five years.[38] After sorting the material dredged from the Channel, IPOP would concurrently reclaim the dredged Channel to its original bathymetry by returning dredged materials to the Channel.[39] IPOP would also dredge an access channel between the man camp set up for the Project and the mining area that would be

District's Denial of a Permit).

[36] AR000360; AR000414. The POD's interim decision was prepared using the administrative record developed by the Alaska District and the Alaska District's Memorandum for Record. AR000359.

[37] AR000360; AR000404. The Memorandum states that "[t]he interim decision document indicated the Applicant's proposed project would not be the [LEDPA]; however, another alternative (On-Site Alternative 2a), a variation of the Applicant's original proposal, was determined to be the LEDPA. After communications with the Applicant, they agreed to proceed with a proposal that matched the LEDPA determination." AR000360. But Defendants' briefing suggests that IPOP independently amended its project proposal to match the LEDPA: "Based on a review of the administrative record and an appeal conference, the Division vacated the District Engineer's decision and elevated the decision to the Division Engineer. IPOP then put forward a different alternative for consideration, the Division reviewed that new proposal, and the Division granted the permit." Docket 25 at 20. The POD Memorandum lists an email from March 8, 2024, as a reference, which appears to be the relevant communication between IPOP and POD, but the email itself is not in the administrative record. AR000469.

[38] AR000348.

[39] AR000348; AR004164.

restored to its original bathymetry once the Project was complete.[40] IPOP would dispose of the excess processed materials at up to four permanent locations adjacent to the dredged area.[41] In total, IPOP would place the excess dredged material in a 159.4-acre area over the life of the Project, instead of the approximately 192.5 acres under the revised IPOP proposal that the Alaska District rejected.[42] Alternative 2a does not include the one-year case study; the Pacific Division stated that the elimination of the case study "would reduce the number/extent of [dredged material disposal sites]."[43] Operations would occur for five years during ice-free periods when the Channel can be accessed by dredging equipment, which is from approximately June 1 through November 1 each year.[44]

In the Memorandum, the Pacific Division defined the purpose of the Project as "to mine for gold from placer deposits within the Safety Sound-Frontal Norton Sound area," eliminating the other purpose that the Alaska District had identified: scientific information gathering.[45] In its consideration of alternatives, the Pacific

---

[40] AR000403-04.

[41] AR000349; AR000242; *see also* AR000415 ("Four DMDSs totaling about 46.7 acres would be used for disposing of excess materials that can't be used in reclamation. Three of these DMDSs are located along the access channel between the launch ramp and the full-scale mining channel. The fourth area is along the five full-scale mining blocks in the full-scale mining channel.").

[42] AR000350; AR002287.

[43] AR000403-04.

[44] AR000349.

[45] AR000363.

Division stated that "[t]his alternatives analysis . . . revisits the alternatives analysis previously performed by [the Alaska District] in the administrative record and reevaluates alternatives to the proposed activity based on adjustments to the project purpose, screening criteria, the screening process, and considers new alternatives not previously evaluated."[46]

The Pacific Division's Memorandum further concluded that "there were no substantial changes to the project as described in [the Alaska District's] second [public notice]" and therefore, the Pacific Division did not issue another public notice, conduct public hearings, or reinitiate consultation with other agencies to inform its consideration of Alternative 2a.[47] However, the Pacific Division did review the comments received during the two public review periods conducted by the Alaska District and provided its own responses to these comments.[48] As relevant here, the Environmental Protection Agency ("EPA") had submitted a comment raising concerns about the lack of information needed to establish a baseline for and evaluate potential adverse impacts to, for example, birds, benthic communities, invertebrates, water quality, and fish habitat.[49] The Pacific Division responded that it "considers the information provided to date, along with other

---

[46] AR000401.

[47] AR000364.

[48] AR000364.

[49] AR000365-68.

information in the public domain, to be adequate to evaluate the permit application."[50]

Additionally, the EPA, Fish and Wildlife Service, and National Marine Fisheries Service ("NMFS") had submitted comments recommending that the Corps prepare an Environmental Impact Statement ("EIS") for the Project.[51] The Pacific Division responded, stating that

> After reviewing the project information, POD has determined that an EIS is not required based on the scope of analysis, the context and intensity of impacts considering available mitigation, and level of significance of project effects. Although the scope of analysis consists of the entire project footprint, the scope does not extend substantially beyond the project limits. The project site is located in a mostly unpopulated area and consists of a small portion of a very large estuary system. Impacts associated with the project are expected to be not significant and adverse and, thus, an EIS was not required.[52]

Accordingly, the Pacific Division prepared an environmental assessment ("EA")[53] and issued a Finding of No Significant Impact ("FONSI").[54] The Memorandum identified Alternative 2a as the LEDPA, concluded that the proposed discharge under Alternative 2a complied with the Section 404 Guidelines, and that the Project

---

[50] AR000366; *see also* AR000367-68.

[51] AR000365; AR000382; AR000385.

[52] AR000365.

[53] AR000347 (stating that the Memorandum "constitutes the Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings for the subject application").

[54] AR000466.

is not contrary to the public interest.[55]

While the POD Memorandum mentions several aspects of the Alaska District's Memorandum, the POD Memorandum does not engage with any contrary factual findings made by the Alaska District.[56]

On April 10, 2025, Plaintiffs initiated this action.[57] Plaintiffs allege that Defendants' issuance of the Permit violated the National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and the Administrative Procedure Act ("APA")[58] and seek vacatur of the Memorandum and the Permit.[59]

---

[55] AR000414; AR000467.

[56] *See* AR000376-77 ("All required consultations under the ESA were completed by POA for this project. As documented later in this decision document, consultations were reviewed for adequacy by POD in consideration of the LEDPA, including subsequent review of newly designated critical habitat since POA's consultations occurred."); AR000401 ("This alternatives analysis by POD revisits the alternatives analysis previously performed by POA in the administrative record and reevaluates alternatives to the proposed activity based on adjustments to the project purpose, screening criteria, the screening process, and considers new alternatives not previously evaluated."); AR000377 ("POA previously provided the Applicant with a list of contacts for MMPA consultation, if needed, but the Applicant has indicated their position is it is not needed because they won't be taking protected species. The required protective measures mentioned above are expected to minimize impacts on marine mammals."); AR000385 ("The Applicant subsequently revised the EFH assessment, and that version was used for consultation with NMFS, which was originally completed by POA. POD has determined reinitiation of consultation per 50 CFR 600.920(l) is not required, as discussed later in this document."); AR000399 ("The POA administrative record contains a copy of all comments received. These concerns were evaluated by POA and determined to not be within POA's scope of review. POD concurs with that conclusion and evaluated these comments as part of the public interest review.").

[57] Docket 1.

[58] Docket 9 at ¶¶ 6, 88-116.

[59] Docket 9 at 31. In March 2026, the State of Alaska Department of Natural Resources denied IPOP's application for "a permit for a multi-year dredging project from 2024 through 2028 which would use a specialized cutter head suction dredge for placer gold mining on three state mining claims as part of IPOP's Bonanza Channel Placer Project." Docket 28-1 at 1. The state agency

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[60]

Plaintiffs have demonstrated Article III standing because their tribal citizens and their members face imminent concrete and particularized injuries that are fairly traceable to Defendants' actions and redressable by a favorable decision.[61] No Defendant disputes that Plaintiffs have standing.

## LEGAL STANDARD

Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations[.]"[62]

Agency action is arbitrary and capricious if it:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before

---

determined that "[a] large-scale dredging project not supported by exploration data accurately showing the location, depth, and size of the mineral deposit would result in unnecessary and undue degradation as defined in AS 27.18.100(9)(a)." Docket 28-1 at 14.

[60] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[61] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see* Docket 17 at 22-24.

[62] 5 U.S.C. § 706(2)(A), (C).

> the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[63]

"In other words, there must be 'a clear error of judgment.'"[64]

By contrast, agency action is proper if "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."[65] "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'"[66] "[A] court is not to substitute its judgment for that of the agency,"[67] and such deference is especially appropriate where "the challenged decision implicates substantial agency expertise."[68] Indeed, "[j]udicial review . . . must be at its most deferential 'when an agency makes . . . predictive or scientific judgments.'"[69]

---

[63] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (quoting *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011)).

[64] *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir. 2008) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

[65] *Ctr. for Biological Diversity*, 900 F.3d at 1067 (quoting *Greater Yellowstone Coal.*, 665 F.3d at 1023).

[66] *Ctr. for Biological Diversity v. BLM*, 833 F.3d 1136, 1146 (9th Cir. 2016) (quoting *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007)).

[67] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[68] *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).

[69] *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641, 661 (9th Cir. 2026) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 182 (2025)).

## DISCUSSION

### I. National Environmental Policy Act

Plaintiffs maintain that the Pacific Division violated NEPA because it failed to "address substantial questions about the Project's environmental impacts raised by the Alaska District and other expert agencies, and because the EA does not take a hard look at those impacts."[70] A court reviews an EA "with two purposes in mind: to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment, and whether its determination that no EIS is required is a reasonable conclusion."[71] "[I]f the agency does not prepare an EIS, it must submit a 'convincing statement of reasons' to explain why the proposed action's environmental impacts will not be significant."[72] "Under certain circumstances, an agency's prior factual findings or conclusions may be 'relevant data' such that an agency must 'articulate a satisfactory explanation' when it changes its mind."[73]

In support of their assertion that the Pacific Division need not have

---

[70] Docket 17 at 25.

[71] *WildEarth Guardians v. U.S. Dep't of Agric.*, 135 F.4th 717, 728 (9th Cir. 2025) (quoting *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022)).

[72] *Id.* (quoting *Env't Def. Ctr.*, 36 F.4th at 879).

[73] *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1262 (9th Cir. 2017) [hereinafter *Zinke*] (citing *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010)).

addressed the concerns raised by the Alaska District and other agencies, Federal Defendants maintain that "the Division and District's decisions were two parts of the same agency action, not separate final actions that required additional explanation about a change of position."[74] Federal Defendants rely on *Defenders of Wildlife v. Zinke*.[75] They contend that "nothing in *Zinke* demands more detailed justification. And where, as here, the purported change of mind coincides with a change in the underlying project proposal that differs significantly from previous project iterations, concerns about previous proposals are not 'inconsistent' and need not be addressed."[76]

In *Zinke*, the plaintiff challenged the defendant federal agencies' approval of a right-of-way over federal lands in Nevada for the construction of an industrial solar project, called Silver State South.[77] Specifically, the plaintiff argued that the biological opinion's ("BiOp") assessments of impacts on the desert tortoise violated the Endangered Species Act ("ESA") and the APA.[78] The district court found that the BiOp complied with the ESA and APA and granted summary judgment for the

---

[74] Docket 25 at 20.

[75] Docket 25 at 21 (citing *Zinke*, 856 F.3d at 1262).

[76] Docket 25 at 22.

[77] *Zinke*, 856 F.3d at 1251.

[78] *Id.*

federal defendants.[79]

On appeal, the plaintiff argued that "the BiOp was arbitrary and capricious because it failed to address the FWS Nevada field office's comments on the [Bureau of Land Management's ("BLM")] draft [supplemental environmental impact statement ("SEIS")] pertaining to adverse impacts on recovery, connectivity of critical habitat, and recommended corridor-width."[80] In addressing this argument, the Ninth Circuit explained that "'the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.'"[81] Nonetheless, the Circuit held that "an agency also 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"[82] And, "[u]nder certain circumstances, an agency's prior factual findings or conclusions may be 'relevant data' such that an agency must 'articulate a satisfactory explanation' when it changes its mind."[83]

To "illustrate[] this principle," the *Zinke* Court examined the Ninth Circuit's

---

[79] *Id.* at 1251-52.

[80] *Id.* at 1262.

[81] *Id.* (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007)).

[82] *Id.* (quoting *Humane Soc'y*, 626 F.3d at 1051).

[83] *Id.* (citing *Humane Soc'y*, 626 F.3d at 1051).

prior decision in *Humane Society of the United States v. Locke*.[84] There, the Ninth Circuit "held that the NMFS did not adequately explain its finding that a sea lion predation rate of 1 percent would have a significant negative impact on the decline or recovery of salmon 'given earlier factual findings by NMFS that fisheries that cause similar or greater mortality among [the salmon population] are *not* having significant negative impacts.'"[85] That was because "the fishery environmental assessments were 'in apparent conflict with NMFS's finding in this case . . . yet the agency has not offered a rationale to explain the disparate findings'"[86] and "the impact of fisheries compared to that of sea lion predation 'ha[d] occupied the center of this controversy from the start.'"[87] As such, "[t]he prior fishery environmental assessments were therefore 'relevant data' which required a 'satisfactory explanation.'"[88]

The *Zinke* Court distinguished the case before it from *Humane Society*. The panel reasoned that in *Zinke*, the field office's "comments on the SEIS did not make any factual or scientific findings" and therefore did not constitute "'divergent'

---

[84] *Id.*

[85] *Id.* at 1262-63 (emphasis in original) (quoting *Humane Society*, 626 F.3d at 1048).

[86] *Id.* at 1263 (quoting *Humane Soc'y*, 626 F.3d at 1049).

[87] *Id.* (quoting *Humane Soc'y*, 626 F.3d at 1051).

[88] *Id.* (quoting *Humane Soc'y*, 626 F.3d at 1051).

findings that required a response in the BiOp."[89] Further, the panel explained that because the SEIS "evaluated three proposed plans for Silver State South that differed significantly from the BLM-preferred alternative analyzed in the BiOp," the field office's comments "would not be inconsistent with the FWS's conclusions regarding Silver State South in the BiOp."[90] Specifically, "[t]he BLM-preferred alternative reduced the size of the project from 3,881 acres to 2,427 acres, increased the width of the corridor between Silver State South and [an adjacent mountain range] at its narrowest point from 100 feet to 1.39 miles . . . , and also incorporated mitigation measures recommended by the FWS in their comments on the SEIS . . . ."[91] The *Zinke* panel therefore held that "the BiOp's failure to address the FWS comments to the SEIS was not arbitrary or capricious" and affirmed the district court's grant of summary judgment to the federal defendants.[92]

This case is more akin to *Humane Society* than *Zinke*. Here, the Alaska District made extensive factual findings and conclusions about aspects of the Project that were not materially different from the Project that the Pacific Division assessed, and the Pacific Division failed to explain why it reached different findings and conclusions about those aspects of the Project. For example, regarding

---

[89] *Id.* (quoting *Humane Soc'y*, 626 F.3d at 1049).

[90] *Id.*

[91] *Id.*

[92] *Id.* at 1263, 1265.

benthic communities, the Alaska District agreed with FWS's conclusion that the project will adversely impact benthic communities.[93] IPOP had asserted that those communities would recover quickly after the end of the Project due to existing natural, extreme disruptions of those communities from storm events and ice.[94] But the District found that because of IPOP's flawed methodology used to gather data about benthic species, it was "difficult to draw conclusions about the benthic communities present and therefore their recovery rates" are unknown.[95] Specifically, the District explained that, in IPOP's survey, "[n]o figures were provided of the locations of sampling and no information was provided on the number of samples collected from the project site. . . Without information on the location of samples collected, nor on the additional sampling beyond homogenization of site samples and subsampling of the homogenized sample, it is difficult to draw robust conclusions about the benthic communities at the project site."[96] And, in response to IPOP's assertion that benthic communities would recover quickly, FWS cited several studies in support of its comment that "[d]epending on the variables, recolonization can be slow and often fails to recover

---

[93] AR002368.

[94] AR002313.

[95] AR002314; *see also* AR002379, AR002382.

[96] AR002413.

to previous levels and communities."[97]

In contrast, and based on the same record,[98] the Division concluded that "[t]here is adequate information in the record provided since the public notices were issued to evaluate impacts to benthic communities" and the impacts to benthic communities were "expected to be temporary in duration, lasting only during the operation of the mining project. The dynamic nature of this estuary, including tidal influences, sediment transport from the rivers, storm/wind events, and ice freeze/thaw regime provide a means for these communities to recover

---

[97] AR003527.

[98] It appears that there are some studies provided in the administrative record that post-date the Alaska District's denial decision, *see* AR002221-82 (2023 Alaska District Planning Assistance to States Technical Report, Solomon Environmental Baseline Technical Assistance); AR001001-03 (2024 Pacific Division Mem. for Record, Subject: Analysis of Noise Issues). As to the noise study, it is not listed as a reference in the POD's Memorandum, *see* AR000467-69. Instead, Federal Defendants rely on this study in their brief to demonstrate that the POD adequately assessed the impact of noise on the Project area, including to birds. Docket 25 at 35-36. However, nowhere does the POD explain that this new noise study ameliorates the Alaska District's concerns as to the impact of the Project on birds. As to the 2023 Solomon Environmental Baseline document, the Pacific Division cited to it in a January 2024 document that it prepared regarding essential fish habitat for the Project. AR001598-604. The Division also cited the baseline study in a section of fish and essential fish habitat in the Memorandum. AR000356-57. However, it does not appear the Division relied on the report as to environmental issues identified by the District and other agencies that Plaintiffs raise here, and Federal Defendants do not assert otherwise.

Further, during the appeal conference conducted by the Division, the Alaska District acknowledged that it did not consider three studies that IPOP submitted after December 16, 2021. AR001013-14. The Memorandum for Record from the appeal conference suggests that some or all of those studies may have been fisheries surveys. AR001016-17. However, there does not appear to be any additional information regarding these studies in the administrative record and Federal Defendants do not identify these studies as part of the basis for the Division's decision.

once these activities have ended."[99] While both the District and the Division concluded that there would be a major impact on benthic communities,[100] the Division concluded that these effects would only be temporary[101] and provided no explanation as to why it disagreed with the District's factual finding that the IPOP study was flawed and that there was insufficient evidence on which to evaluate the timing and likelihood of success of recovery of benthic communities.[102]

Indeed, POD's Memorandum does not mention the Alaska District's findings and conclusions regarding IPOP's methodology. In their response brief, Federal Defendants assert that the Corps had adequate data to analyze impacts to benthic communities, citing IPOP's 2020, 2021, and 2022 benthic communities studies,[103]

---

[99] AR000367, AR000420.

[100] AR002368, AR000419.

[101] AR000420.

[102] Federal Defendants contend that "the primary difference between the Division and District decisions is in the weight they put on site-specific data IPOP collected and whether they felt sufficient information was available to reach conclusions about the proposed reclamation." Docket 25 at 30. But the District had found that IPOP's study was unreliable and the Division relied on the IPOP study without explaining why it disagreed with the District's conclusion on its reliability. This is more than a difference in weight; it goes to the fundamental reliability of IPOP's study.

[103] Docket 25 at 28-29 (citing AR000367). The Court presumes that the Division referred to the studies conducted by David Eilers. *See* AR000358 (David Eilers, M.S. conducted a preliminary benthic macroinvertebrate study for the Applicant on October 10, 2020 . . . . Additional benthic surveying was conducted by the Applicant on August 8, 2021 . . . ."); AR000366 ("POD's Evaluation: In response to comments from EPA, U.S. Fish and Wildlife Service (USFWS), and others regarding lack of information on impacts, IPOP collected substantial data for the ten western claims during the summers of 2020 and 2021 and in spring 2022."). However, the Division only included one study by Eilers on its reference list titled Bonanza Channel Bathymetric Mapping and Seagrass Study. AR000468.

as well as the Otero 2020 study.[104] However, those are the same studies that the District considered and found to be so flawed that they could not be relied upon to predict recovery rates for those communities.[105] And POD heavily relied on the data provided by IPOP, determining that "[b]ecause of the remote location of this project and the lack of any precedential projects in this area or elsewhere in Alaska, site-specific information for this project site is derived primarily from baseline studies conducted by the Applicant."[106] POD did this without acknowledging that the Alaska District had reached the opposite conclusion as to the reliability of IPOP's data.

Regarding submerged vegetation, the Alaska District concluded that

> the data collected on the ability of the [submerged aquatic vegetation (SAV)] to recolonize the dredged areas does not follow acceptable scientific methodology and therefore conclusions drawn from the report are not necessarily accurate nor can they necessarily be extrapolated to the full-scale operations. The test dredge used several approximately 9 square feet (sf) area by less than four feet deep test dredge areas, while proposed full scale mining is 21. 7 acres (945,252 sf) and depths of 31 feet. Based on the inability of the Corps to extrapolate the results of the SAV Recovery Report (SAV Recovery Eilers 2021) to the larger mining project, and the uncertainties with the proposed reclamation in a subarctic estuarine estuary, the Corps has determined that there would be a major impact to vegetated shallows.[107]

---

[104] Docket 25 at 28-29 (citing AR000366).

[105] AR002411-14 (Eilers 2020, 2021, and 2022 studies); AR002415 (Otero 2020 study).

[106] AR000366.

[107] AR002371.

The District further concluded that the time for the ecosystem "to recover from these localized disturbances is not known."[108]

The Division does not discuss the District's assessment of inadequacy of IPOP's information on submerged vegetation. Rather, based on the same record before the District, it relied primarily on the 2020 Eilers study[109] and concluded that "the substantial natural processes that cyclically affect this estuary and the tendency for the dominant aquatic plant (sago pondweed) to readily revegetate the channel bottoms make it likely that these disturbed areas would recover quickly to their approximate original condition and density of vegetation."[110] In their response brief, Federal Defendants maintain that "[t]he Corps reasonably evaluated the project's potential effects on submerged aquatic vegetation," citing IPOP's "site-specific surveys in 2020."[111] But again, the studies the POD relied on were the same ones discredited by the Alaska District, and the POD failed to explain why it disagreed with the Alaska District's contrary finding.[112]

---

[108] AR002390.

[109] AR000355. POD also cited a 2010 Casey report titled Plant Guide for Sago Pondweed, AR000356, AR000468, in support of POD's finding that "sago pondweed, which is the dominant species in the channel, can tolerate a wide range of substrate types, low flow rates (less than 1 meter/sec), and water depths less than 2.5 meters deep." AR000356. It does not appear that the Alaska District reviewed this study. *See* AR002403-08.

[110] AR000421-22.

[111] Docket 25 at 31 (citing AR000355).

[112] AR002411-14 (Eilers 2020, 2021, and 2022 studies).

Both the District and the Division concluded that the Project's impact on vegetated shallows would be major,[113] but the Division did not explain why it disagreed with the District's factual finding that the IPOP study was flawed and there was insufficient evidence on which to conclude that the vegetated shallows would recover quickly.

As to birds, the District explained that FWS were "the experts as to their trust resources" and agreed with FWS's conclusion that "with the removal of the benthic communities and SAV, feeding opportunities for migratory birds would be reduced."[114] Further, the District agreed that the timing of the proposed dredging operations would intersect with migratory and nesting seasons and displaced and/or abandoned nests may result from birds that had nested at the man camp site or within noise and visual disturbance range of the dredging operations.[115] The District concluded that the impact on birds, as well as other wildlife, would be major.[116] Further, the District noted that IPOP asserted that the Project would be only a small footprint within the Safety Sound system. But the District disagreed, concluding that the project would occupy approximately 16% of

---

[113] AR002371; AR000421.

[114] AR002313.

[115] AR002313.

[116] AR002368.

the Bonanza Channel itself.[117]

In contrast, the Division concluded that there would only be a minor effect on wildlife, including birds, because "the project site is a relatively small part of a much more expansive estuary system with a large ecosystem capacity and the project is not expected to adversely affect bird/terrestrial wildlife populations. Any effects would be temporary."[118] The Division did not explain why it disagreed with the District's conclusion that impacts to birds and other wildlife would be major or why, in its view, the Project constituted only a small part of the estuary system such that any impact would be minor and temporary.

Further, the District and Division made divergent factual findings as to the severity of potential impacts on various environmental features. For example, the District found that the Project would have a major effect on physical substrate, water circulation and fluctuation, suspended particulates and turbidity, aquatic ecosystems and organisms, and the proposed disposal site.[119] In contrast, the Division concluded that while there would be major effects to the aquatic ecosystem and organisms and the proposed disposal site, there would be only a minor effect (long-term) as to physical substrate and water circulation and

---

[117] AR002392.

[118] AR000420; *see also* AR000439 ("This project would affect a small area in a very large estuary . . . .").

[119] AR002379.

fluctuation and a minor effect (short-term) as to suspended particulates and turbidity.[120] Here again the Division failed to explain its rationale for reaching a different conclusion from the District; indeed, it did not even acknowledge the District's different conclusions.

Not only are the Pacific Division's findings "in apparent conflict" with the Alaska District's findings; the Division's findings are also unsupported by "a rationale to explain the disparate findings,"[121] Moreover, these environmental issues have "occupied the center of this controversy from the start."[122] Indeed, the District noted that, notwithstanding IPOP's efforts to provide additional information and its submission of the revised case study project proposal, EPA, FWS, and other agencies had "maintained their objections after considering your reclamation plan and revised proposal (e.g. the case study)."[123]

Further, while Alternative 2a would reduce impacts to WOTUS from 192.5 acres to 159.4 acres due to the removal of the case study and the restoration of the original bathymetry of the access channel, the Pacific Division did not meaningfully engage with the concerns of the other agencies and the District

---

[120] AR000427-28.

[121] *Humane Soc'y*, 626 F.3d at 1049.

[122] *Id.* at 1051.

[123] AR002285; *see also* AR002305-40 (recounting comments on the project from EPA, FWS, and NMFS).

regarding the lack of available information as to the environmental baseline of the Channel and Safety Sound as well as the lack of reliable studies from which any adverse effects could be determined.[124] Nor did the Division explain if or how the removal of the case study and the restoration to original bathymetry impacted its decision to diverge from the District's findings as to the potential impacts to multiple components of the environment.

Therefore, like the contrary factual findings by NMFS in *Humane Society*, the District's extensive factual findings and conclusions were "'relevant data' such that [the Pacific Division] must 'articulate a satisfactory explanation' when it changes its mind."[125] As such, the Court finds that the Pacific Division's EA "is incomplete and inadequate to permit meaningful judicial review" and therefore the issuance of the Permit was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[126]

This conclusion is supported by the district court's reasoning in *Alliance to Save the Mattaponi v. United States Army Corps of Engineers*, a non-binding but persuasive opinion from the District Court for the District of Columbia.[127] In that case, the city of Newport News applied for a Section 404 permit to build a

---

[124] AR002287; AR000350.

[125] *Zinke*, 856 F.3d at 1262 (citing *Humane Soc'y*, 626 F.3d at 1051).

[126] *Humane Soc'y*, 626 F.3d at 1053 (quoting 5 U.S.C. § 706(2)(A)).

[127] 606 F. Supp. 2d 121 (D.D.C. 2009).

reservoir.[128] EPA, FWS, and the Norfolk District of the Corps each recommended the denial of the permit; the Norfolk District found that the project would cause significant degradation of WOTUS, that less damaging alternatives were available, and that the project was not in the public interest.[129] Thereafter, the Governor of Virginia objected to the proposed denial of the permit, and the application was referred to the North Atlantic Division of the Corps.[130] The North Atlantic Division ultimately approved the permit, finding that Newport News' mitigation plan would "adequately compensate for lost wetlands and their functions and therefore overall there would be no significant degradation."[131] The plaintiffs then sued the Corps, arguing that the North Atlantic Division's finding that there would be no significant degradation due to mitigation was contrary to the evidence before it, pointing to letters from the EPA and FWS as well as the Norfolk District's recommended decision.[132]

In concluding that the mitigation plan would adequately compensate for lost wetlands, the North Atlantic Division explained that Newport News had conducted

---

[128] *Id.* at 125.

[129] *Id.*

[130] *Id.*

[131] *Id.* at 126, 131.

[132] *Id.* at 132.

functional assessments for the project that were based on three other studies.[133] But the North Atlantic Division "[did] not address anywhere the fact that the same [three studies] on which Newport News based its functional assessments were seriously critiqued by the Norfolk District in [its recommendation to deny the permit]."[134] The Court found that "[i]n the face of such criticism, the Corps must explain why it believes that the methods used by Newport News in the functional assessment are a reliable basis for concluding that 'successful completion of the elements of the Streams & Wetlands Mitigation Plan will as a whole offset anticipated losses in these functional areas.'"[135]

Further, the district court found that the North Atlantic Division failed to "address comments that without more site-specific information it is impossible to determine whether the Mitigation Plan will replace functional values to the point where the Project does not cause or contribute to significant degradation."[136] The district court explained that the Corps "must demonstrate that it has considered significant comments and criticisms by explaining why it disagrees with them; it may not dismiss them without adequate explanation."[137] Because it had failed to

---

133 *Id.* at 132-33.

134 *Id.* at 133.

135 *Id.*

136 *Id.*

137 *Id.* at 132.

provide such explanation, the district court found that the North Atlantic Division's conclusion that the permit would not cause or contribute to significant degradation was arbitrary and capricious.[138]

The same has occurred here. The Pacific Division failed to explain why it disagreed with the District's analysis and other agencies' findings, rendering its decision to issue the Permit arbitrary and capricious.

Citing *Zinke*, Federal Defendants seek to avoid this result by maintaining that the permit review process was "a single agency action undertaken by the Corps, not separate actions by the Division and the District."[139] But, in *Zinke*, the Ninth Circuit considered the substance of the FWS field office's comments on the SEIS to hold that the comments were not "divergent" findings that required a response in the BiOp.[140] The *Zinke* Court did not reject the plaintiff's argument simply because the findings were offered by another office within the same agency in the course of the agency's action.

Federal Defendants also maintain that because, like in *Zinke*, "the project proposal considered by the Division was different in significant ways from the proposal the District denied, there was no inconsistency that the Division was

---

[138] *Id.* at 132, 134.

[139] Docket 25 at 20.

[140] *Zinke*, 856 F.3d at 1263.

required to explain."[141] But, as Plaintiffs point out, this assertion is at odds with Federal Defendants' acknowledgement that "while On-Site Alternative 2a differed from IPOP's previous proposed alternative, the Division concluded there were no substantial changes to the overall project that required [additional] public notice and comment."[142] Indeed, the Alaska District considered an alternative that would require restoration of the pre-project bathymetry "in all impact areas," which is a key aspect of Alternative 2a selected by the Division as the LEDPA.[143] The District found that alternative "should increase the likelihood of site success."[144] However, IPOP was unwilling to amend its proposal at that time to include the restoration of the entire bathymetry.[145] The two primary differences between the proposal before the District and that before the Division are the restoration of the entire project area to the original bathymetry and the removal of the case study. But the Division did not explain how these two changes would impact the District's findings and other

---

[141] Docket 25 at 20.

[142] Docket 25 at 14 n.4; *see* Docket 28 at 11; AR000364 ("[T]here were no substantial changes to the project as described in POA's second [public notice].").

[143] AR002351; *see also* AR002359-61 (considering Alternative 4 which would require restoration of the entire project site to pre-project bathymetry).

[144] AR002351.

[145] AR002360-61. Federal Defendants also state that it was IPOP that put forth an alternative proposal that matched the LEDPA, but the record suggests that the Division informed IPOP that its alternative was not the LEDPA and provided IPOP with the LEDPA alternative. *Compare* Docket 25 at 20 ("IPOP then put forward a different alternative for consideration, the Division reviewed that new proposal, and the Division granted the permit.") *with* AR000360 (stating that IPOP "agreed to proceed with a proposal that matched the LEDPA determination.").

agencies' concerns regarding the Project's impact on benthic communities, submerged vegetation, birds and wildlife, and other environmental impacts. Nor did the Division explain how these environmental impacts would be ameliorated by these changes. And the Division also did not explain why it determined that the information supplied by IPOP was adequate to support issuance of the Permit and why it disagreed with the District's and other agencies' contrary determinations on this point. Federal Defendants do not contend that the Pacific Division meaningfully engaged with the Alaska District's findings; rather, Federal Defendants contend that the Division "acknowledged the District's vacated decision," which they maintain "alone is sufficient."[146] But for the reasons set forth above, the Court disagrees and finds that Defendants violated the APA by failing to provide a "satisfactory explanation" for why it disagreed with the District's and other agencies' extensive contrary factual findings and determinations.[147]

Plaintiffs maintain that the Pacific Division also must prepare an EIS because substantial questions exist as to the Project's impact on the environment.[148] "[P]reparation of an EIS is not mandated in all cases simply because an agency has prepared a deficient EA or otherwise failed to comply with

---

[146] Docket 25 at 23 (citing AR000359-60); *see also* Docket 25 at 25 ("The Corps adequately acknowledged the District's decision.").

[147] *Zinke*, 856 F.3d at 1263 (quoting *Humane Soc'y*, 626 F.3d at 1051).

[148] *See, e.g.*, Docket 17 at 26.

NEPA. If, for example, an EA is so procedurally flawed that [a court] cannot determine whether the proposed rule or project may have a significant effect, the court should remand for the preparation of a new EA."[149]

That is the case here. The EA is so procedurally flawed because the Division failed to explain its divergence from the District's findings such that, on the current record, the Court cannot determine whether the Project may have a significant effect such that an EIS is required. Therefore, the Court declines to determine whether an EIS is required at this juncture.

## II. Clean Water Act

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[150] To achieve this goal, the CWA prohibits the discharge of any pollutant into navigable waters unless authorized by a permit.[151] Section 404 of the CWA governs permitting for the discharge of dredged or fill material into waters of the United States (WOTUS).[152] The Corps is responsible for issuing Section 404 permits, and it does so according to EPA's

---

[149] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1178 (9th Cir. 2008) (citing *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000) (ordering remand for preparation of a new EA, where prior EA was prepared after the agency had already rendered a substantive decision on the permitting action)).

[150] 33 U.S.C. § 1251(a).

[151] *See id.* § 1311(a).

[152] *See* Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, § 2, 86 Stat. 816, 884; 33 U.S.C. § 1344.

Section 404(b)(1) Guidelines.[153] Those guidelines state in relevant part: "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States."[154] The regulation enumerates "effects" that should be considered in assessing "degradation related to the proposed discharge," which include "[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare, . . . life stages of aquatic life and other wildlife . . . , aquatic ecosystem diversity, productivity, and stability . . . , [and] recreational, aesthetic, and economic values."[155] In determining whether a discharge will significantly degrade the waters of the United States, the Corps must consider "the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment," including the secondary effects on an "aquatic ecosystem that are associated with a discharge of dredged or fill materials."[156]

The Alaska District had found that the Project would cause or contribute to significant degradation of WOTUS and that all appropriate and practicable steps

[153] *See* 33 C.F.R. § 320.4(a)(1) ("For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the [EPA's] 404(b)(1) guidelines.").

[154] 40 C.F.R. § 230.10(c).

[155] *Id.* § 230.10(c)(1)-(4).

[156] *Id.* § 230.11(h)(1).

had not been taken to minimize adverse impacts to the aquatic ecosystem.[157] The District also concluded that the Project would be contrary to the public interest in regard to recreation.[158]

Plaintiffs maintain that "[t]he Pacific Division violated the Clean Water Act by failing to make rational factual determinations in its permit decision and by issuing a permit that allows significant degradation of WOTUS."[159] Specifically, Plaintiffs contend that "[c]ontrary to the Alaska District, which found the Project would have major effects in seven of the eight impact categories based on the information (or lack thereof) contained in the record, the Pacific Division found negligible or minor impacts for six of the eight categories."[160] Further, "[e]ven in the two categories where the Division did find major impacts (aquatic ecosystems and organisms and the proposed disposal site), [Plaintiffs contend that the Division] downplayed those impacts without record support."[161] And, as similarly argued regarding their NEPA claim, Plaintiffs assert that the Division neither "acknowledge[d] the differences in the District's factual conclusions" nor "respond[ed], even indirectly, to the facts and

---

[157] AR002381.

[158] AR002386, AR002389.

[159] Docket 17 at 41.

[160] Docket 17 at 42 (citing AR002379-80, AR000565-66).

[161] Docket 17 at 42 (citing AR000566-67).

serious concerns underlying the District's conclusions."[162] In Plaintiffs' view, this "rendered the Division's conclusions about impacts to benthic communities, aquatic ecosystems and organisms, subsistence, and recreation arbitrary for the Clean Water Act's purposes, just as they are arbitrary for NEPA's purposes."[163]

The Court agrees with Plaintiffs. Above, the Court found that the Pacific Division failed to "articulate a satisfactory explanation" as to why it was diverging from the District's factual findings and conclusions as to the environmental impacts of the Project.[164] That rendered the Pacific Division's EA "incomplete and inadequate to permit meaningful judicial review" and therefore the issuance of the Permit was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[165] Because the EA was in support of the Pacific Division's finding under the CWA that "[t]he proposed discharge complies with the [Section 404(b)(1)] Guidelines," that conclusion and the resulting issuance of the Permit are similarly arbitrary and capricious.

## REMEDY

Plaintiffs maintain that vacatur is the proper remedy.[166] Defendants contend

---

[162] Docket 17 at 42.

[163] Docket 17 at 42-43.

[164] *Humane Soc'y*, 626 F.3d at 1051.

[165] *Id.* at 1053 (quoting 5 U.S.C. § 706(2)(A)).

[166] Docket 17 at 47.

that "the issues of remedy and whether vacatur is appropriate should be addressed in supplementary briefing after the Court's decision on the merits."[167]

The Court finds that in this particular case, additional briefing on the nature of the appropriate remedy is warranted. Therefore, each party may file a supplemental brief addressing the proper remedy in this case **within 21 days of the date of this order; such brief shall not exceed 15 pages**. Each party will then have **an additional 14 days to file a response, not to exceed 8 pages**.

IT IS SO ORDERED this 2nd day of November, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

[167] Docket 25 at 43.